No. 25-13291

# United States Court of Appeals

*for the*

# Eleventh Circuit

———————— • ————————

CAMALYN TURNER,

*Plaintiff-Appellee,*

– v. –

ATLANTA INDEPENDENT SCHOOL SYSTEM, MATTHEW SMITH, CHELSEA MONTGOMERY, Individually,

*Defendants-Appellants,*

DR. BRYAN JOHNSON, Superintendent, in his official capacity,

*Defendant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
IN NO. 1:24-CV-03781-AT, HONORABLE AMY TOTENBERG

## BRIEF FOR DEFENDANTS-APPELLANTS

BRANDON O. MOULARD
BENNETT D. BRYAN
PARKER POE ADAMS & BERNSTEIN LLP
*Attorneys for Defendants-Appellants*
1075 Peachtree Street, NE, Suite 1500
Atlanta, Georgia 30309
(678) 690-5750

*Camalyn Turner v. Atlanta Independent School System, et al.*

No. 25-13291

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, counsel for Defendants/Appellants hereby give notice and certify that the following is a complete list of the trial judge, all attorneys, persons, associations of persons, firms, partnerships, or corporations currently known to have an interest in the outcome of this case:

1. Atlanta Independent School System: Appellant

2. Bryan, Bennett D.: counsel of record for Appellants

3. Goodmark, Craig: lead counsel of record for Appellee

4. Goodmark Law Firm: law firm for Appellee

5. Law Offices of Gerry Weber, LLC: law firm for Appellee

6. Montgomery, Chelsea: Appellant

7. Moulard, Brandon O.: lead counsel of record for Appellants

8. Parker Poe Adams & Bernstein LLP: law firm for Appellants

9. Smith, Matthew: Appellant

10. Totenberg, Amy: United States District Court Judge

11. Turner, Camalyn: Appellee

12. Weber, Gerald: counsel of record for Appellee

No publicly traded company or corporation has an interest in the outcome of this appeal

C-1 of 1

## STATEMENT ON ORAL ARGUMENT

This appeal raises an open question of significant importance: whether circuit precedent decided under step two of the *Chevron* framework—including *Shotz v. City of Plantation, Fla*., 344 F.3d 1161 (11th Cir. 2003)—remains good law after the Supreme Court overruled *Chevron* in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

Disagreement about *Loper Bright*'s impact on *Chevron* precedent has divided the federal circuits generally and the judges of the Eleventh Circuit specifically. Some say *Loper Bright* abrogates all *Chevron*-based precedent; others claim it lacks any impact on those cases whatsoever. Still others suggest *Loper Bright* abrogates only those circuit cases decided under *Chevron* step two—when congressional intent is ambiguous.

This appeal provides an excellent vehicle to examine *Loper Bright*'s impact on step-two precedents because *Shotz*'s holding relied exclusively on agency regulations and did not purport to interpret the ADA's statutory text for itself under step one. Oral argument will allow the Court to more fully explore these and other important questions.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT..................................................................C-1

STATEMENT ON ORAL ARGUMENT ...................................................i

TABLE OF CITATIONS ......................................................................iv

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES.............................................................2

INTRODUCTION ................................................................................4

STATEMENT OF THE CASE................................................................7

    I.     Statement of Facts .................................................................7

         A.    The Parties...................................................................7

         B.    Turner's Reports .........................................................8

         C.    The Alleged Retaliation ..............................................8

    II.    District Court Proceedings .....................................................9

STANDARD OF REVIEW ...................................................................11

SUMMARY OF THE ARGUMENT .......................................................11

ARGUMENT AND CITATIONS OF AUTHORITY ...............................14

    I.     The district court should have dismissed Turner's ADA
         retaliation claim against Smith and Montgomery based on
         qualified immunity. ..............................................................14

         A.    This Court should depart from *Shotz* and hold that
               public officials are not individually liable for retaliation
               under the ADA. .........................................................16

               1.    The statutory text and structure preclude
                      individual liability for any ADA violation,
                      including retaliation in the public services
                      context............................................................16

i

2. *Loper Bright* has undermined *Shotz* to the point of abrogation ................................................................21

B. *Shotz* does not clearly establish Smith and Montgomery's liability for qualified immunity purposes, nor could it. ................................................................29

1. Qualified immunity applies when existing law does not clearly establish a defendant's potential liability under the cause of action alleged ......................30

2. *Shotz* does not amount to clearly established law for qualified immunity purposes ....................................34

3. A reasonable official could doubt whether *Shotz* applies in this factual context .........................................37

II. The district court erred by not dismissing Turner's First Amendment claims.................................................................39

A. Turner's First Amendment claims fail under Rule 12(b)(6) because she did not plausibly allege that she spoke as a private citizen. ..........................................40

1. Under *Garcetti*, speech made pursuant to an employee's job duties is not constitutionally protected ........................................................................40

2. Turner's speech was not protected under *Garcetti* .................................................................42

a. Turner's IDEA-compliance disclosures were part of her core duties ..................................43

b. Turner's grading-related disclosures were tied to her oversight of student discipline and records ..........................................................45

c. Turner's participation in the holiday party investigation was employee speech ....................46

3. The district court incorrectly analyzed Turner's speech ........................................................................48

B. Qualified immunity bars the claims against Smith and Montgomery.................................................................50

CONCLUSION .......................................................................55

# TABLE OF CITATIONS

**Page(s)**

**Cases:**

*Abdur-Rahman v. Walker*,
   567 F.3d 1278 (11th Cir. 2009) .................................................................. *passim*

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................... 16, 17

*Alves v. Bd. of Regents*,
   804 F.3d 1149 (11th Cir. 2015) .................................................... *passim*

*Anderson v. Creighton*,
   483 U.S. 635 (1987) ......................................................................30

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ......................................................................54

*Atkins v. Hopkins*,
   137 F.4th 286 (5th Cir. 2025) ......................................................32

*Baird v. Rose*,
   192 F.3d 462 (4th Cir. 1999) .......................................................18

*Bastias v. U.S. Att'y Gen.*,
   ___F.4th___, 2025 WL 3029701 (11th Cir. 2025) ..................... 24, 25

*Battle v. Bd. of Regents*,
   468 F.3d 755 (11th Cir. 2006) .....................................................52

*Benavides v. Georgia Pub. Def. Council*,
   2021 WL 2448360 (N.D. Ga. Jan. 14, 2021) ...............................49

*Boyce v. Andrew*,
   510 F.3d 1333 (11th Cir. 2007) ...................................................41

*Brown v. Monsalud*,
   No. 24-1555, 2025 WL 2803768 (3d Cir. Oct. 2, 2025) ...............36

*Bruce v. Beary*,
   498 F.3d 1232 (11th Cir. 2007) ...................................................35

*Carollo v. Boria*,
   833 F.3d 1322 (11th Cir. 2016) ............................................ 49, 50, 53

*Cavalieri v. Avior Airlines C.A.*,
    25 F.4th 843 (11th Cir. 2022) ..............................................................11

*Chambers v. Cherokee County*,
    743 F. App'x 960 (11th Cir. 2018) .................................................. 48-49

*Chambers v. Thompson*,
    150 F.3d 1324 (11th Cir. 1998) .............................................................21

*Coleman v. Child.'s Hosp. of Philadelphia*,
    No. 23-3064, 2024 WL 4490602 (3d Cir. Oct. 15, 2024) ....................24

*Corbitt v. Vickers*,
    929 F.3d 1304 (11th Cir. 2019) .............................................................15

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
    ___ F. Supp. 3d ___, No. CV 24-86-M-DWM,
    2025 WL 2223573 (D. Mont. Aug. 5, 2025) .........................................28

*Cunningham v. Gates*,
    229 F.3d 1271 (9th Cir. 2000) ...............................................................33

*Datto v. Univ. of Miami*,
    No. 18-CV-21053, 2020 WL 7344680 (S.D. Fla. July 23, 2020), *report and recommendation adopted in relevant part*, No. 18-CV-21053,
    2020 WL 6389987 (S.D. Fla. Nov. 2, 2020) .........................................38

*Davis v. Scherer*,
    468 U.S. 183 (1984) ...............................................................................30

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
    26 F.4th 1214 (11th Cir. 2022) ...................................................... 21, 22

*DeLoach v. Bevers*,
    922 F.2d 618 (1990) ...............................................................................35

*District of Columbia v. Wesby*,
    583 U.S. 48 (2018) .................................................................................30

*Dominion Energy Brayton Point, LLC v. Johnson*,
    443 F.3d 12 (1st Cir. 2006) ...................................................................28

*Emerson v. Thiel Coll.*,
    296 F.3d 184 (3d Cir. 2002) ..................................................................18

*Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*,
  958 F.3d 873 (9th Cir. 2020), *rev'd on other grounds by Becerra v. Empire*
  *Health Found., for Valley Hosp. Med. Ctr.,* 597 U.S. 424 (2022) .......................28

*Fisher v. Moore*,
  73 F.4th 367 (5th Cir. 2023) ...............................................................................33

*G. v. Fay Sch.*,
  931 F.3d 1 (1st Cir. 2019) ..................................................................................18

*Gadjiev v. Atlanta Indep. Sch. Sys.*,
  No. 1:12-CV-2700-JEC, 2013 WL 5349854 (N.D. Ga. Sept. 23, 2013) ...... 38, 49

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ................................................................................. *passim*

*Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*,
  280 F.3d 98 (2d Cir. 2001) .................................................................................18

*Gilmore v. Georgia Dep't of Corr.*,
  144 F.4th 1246 (11th Cir. 2025) .................................................................. 15, 51

*Glow In One Mini Golf, LLC v. Walz*,
  37 F.4th 1365 (8th Cir. 2022) .............................................................................32

*Gutierrez-Brizuela v. Lynch*,
  834 F.3d 1142 (10th Cir. 2016) ..........................................................................27

*Hall v. Thomas*,
  190 F.3d 693 (5th Cir. 1999) ..............................................................................33

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ...........................................................................................25

*Harding v. Steak N Shake, Inc.*,
  745 F. Supp. 3d 571 (N.D. Ohio 2024) ........................................................ 24, 36

*Hartley v. Parnell*,
  193 F.3d 1263 (11th Cir. 1999) ..........................................................................19

*Hartman v. Moore*,
  547 U.S. 250 (2006) ...........................................................................................35

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ............................................................. 14, 15, 51

*Jennings v. Sec'y, Fla. Dep't of Corr.*,
    108 F.4th 1299 (11th Cir. 2024) ............................................................21

*Keating v. City of Miami*,
    598 F.3d 753 (11th Cir. 2010) ....................................................... 15, 51

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ................................................................................48

*Key v. Grayson*,
    163 F. Supp. 2d 697 (E.D. Mich. 2001) ...............................................19

*King v. Bd. of Cnty. Commissioners*,
    916 F.3d 1339 (11th Cir. 2019) ....................................... 47, 50, 52, 54

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
    145 S. Ct. 2814 (2025) ...........................................................................20

*Lane v. Franks*,
    573 U.S. 228 (2014) ................................................................... *passim*

*Leslie v. Hancock Cnty. Bd. of Educ.*,
    720 F.3d 1338 (11th Cir. 2013) .............................................................33

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ................................................................... *passim*

*Lopez v. Bondi*,
    151 F.4th 1196 (9th Cir. 2025) ....................................... 21, 24, 26, 36

*Lopez v. Garland*,
    116 F.4th 1032 (9th Cir. 2024) .............................................................23

*Mattix v. DeKalb County Sch. District*,
    2014 WL 3579416 (N.D. Ga. July 18, 2014) .....................................49

*Metro. Hosp. v. U.S. Dep't of Health & Hum. Servs.*,
    712 F.3d 248 (6th Cir. 2013) .................................................................28

*Modica v. Taylor*,
    465 F.3d 174 (5th Cir. 2006) .................................................................31

*Moss v. City of Pembroke Pines*,
    782 F.3d 613 (11th Cir. 2015) ...............................................................40

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ....................................................................................30

*N.T. v. Espanola Pub. Sch.*,
  No. CIV 04-0415 MCA/DJS, 2005 WL 5840479 (D.N.M. May 20, 2005) ........19

*Nat'l Cable and Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ..................................................................... *passim*

*Ozurumba v. Bondi*,
  153 F.4th 396 (4th Cir. 2025) ....................................................... 23, 28

*Pearson v. Callahan*,
  555 U.S. 223 (2009) .............................................. 14, 15, 36-37, 53

*Phillips v. City of Dawsonville*,
  499 F.3d 1239 (11th Cir. 2007) ................................................... *passim*

*Ponce v. U.S. Att'y Gen.*,
  141 F.4th 1214 (11th Cir. 2025) ................................................. 22, 24

*Quito-Guachichulca v. Garland*,
  122 F.4th 732 (8th Cir. 2024) .............................................................23

*Reichle v. Howards*,
  566 U.S. 658 (2012) ................................................................. 30, 34, 35

*Scott v. Harris*,
  550 U.S. 372 (2007) .............................................................................1

*Sheba Ethiopian Rest., Inc. v. DeKalb Cnty., Georgia*,
  No. 21-13077, 2023 WL 3750710 (11th Cir. June 1, 2023) ................................33

*Shotz v. City of Plantation, Fla.*,
  344 F.3d 1161 (11th Cir. 2003) ................................................... *passim*

*Slay v. Hess*,
  621 F. App'x 573 (11th Cir. 2015)......................................................49

*Smith v. LePage*,
  834 F.3d 1285 (11th Cir. 2016) ........................................................1, 8

*Sobel v. St. Mary's Hosp. & Med. Ctr., Inc.*,
  No. 21-CV-00971-MEH, 2021 WL 5736438 (D. Colo. Dec. 2, 2021) ..............38

*Sterling Hotels, LLC v. McKay*,
  71 F.4th 463 (6th Cir. 2023)..............................................................31

*Tennessee v. Becerra*,
  131 F.4th 350 (6th Cir. 2025) ..................................................... 23, 24

*United States v. Florida*,
  938 F.3d 1221 (11th Cir. 2019) .................................................................... 17, 20

*United States v. Lanier*,
  520 U.S. 259 (1997) ....................................................................................14

*United States v. Petite*,
  703 F.3d 1290 (11th Cir. 2013), *abrogation on other grounds recognized by*
  *United States v. Ford*, 649 F. App'x 756, 760 (11th Cir. 2016) .........................22

*WBY, Inc. v. Dekalb Cnty.*,
  No. 1:14-CV-0253-LMM, 2016 WL 3128397 (N.D. Ga. Jan. 13, 2016),
  *aff'd sub nom. WBY, Inc. v. DeKalb Cnty., Georgia*,
  695 F. App'x 486 (11th Cir. 2017).................................................................35

*White v. Pauly*,
  580 U.S. 73 (2017) .................................................................................. 37, 54

*Wilson v. Layne*,
  526 U.S. 603 (1999) ....................................................................................36

*Woodward v. City of Worland*,
  977 F.2d 1392 (10th Cir. 1992).....................................................................32

*Yerdon v. Poitras*,
  120 F.4th 1150 (2d Cir. 2024) ......................................................................18

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) .............................................................................. 30, 31, 36

## Constitutional Provisions:

U.S. Constitution, Amend. I............................................................................. *passim*

U.S. Constitution, Amend. V ..................................................................... 31, 32

U.S. Constitution, Amend. XIV..........................................................................32

## Statutes & Other Authorities:

20 U.S.C. § 1415(k)(1)(E)(i)............................................................................44

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ............................................................................................1

42 U.S.C. § 12111 ..........................................................................................17

42 U.S.C. § 12131 ..........................................................................................17

42 U.S.C. § 12181 ................................................................................17

42 U.S.C. § 12203(a) ...................................................................... 17, 19

42 U.S.C. § 12203(c) ..........................................................................19

42 U.S.C. § 1983 ..................................................................................1

O.C.G.A. § 20-2-154.1 .......................................................................45

O.C.G.A. § 20-2-154.1(a) ...................................................................45

O.C.G.A. § 20-2-154.1(b) ...................................................................45

O.C.G.A. § 20-2-154.1(c) ...................................................................45

Amy Coney Barrett, *Statutory Stare Decisis in the Court of Appeals*,
73 Geo. Wash. L. Rev. 317 (2005) ..................................................26

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 28 U.S.C. § 1331 because the complaint asserts federal claims, including retaliation claims under the Americans with Disabilities Act (ADA) and 42 U.S.C. § 1983, which form the subject of this appeal.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is taken from a district court's order denying qualified immunity to Appellants Smith and Montgomery. *Scott v. Harris*, 550 U.S. 372, 376 n. 2 (2007). And this Court has discretion to exercise pendent appellate jurisdiction over Atlanta Independent School System's appeal because the issues raised are "inextricably intertwined" with the qualified immunity appeal. *See Smith v. LePage*, 834 F.3d 1285, 1292 (11th Cir. 2016).[1]

Appellants timely noticed this appeal on September 19, 2025. And Appellants timely file this brief in accordance with the Court's order granting Appellants an extension of time until December 15, 2025, to file their opening brief.

---

[1] On October 22, 2025, this Court issued jurisdictional questions [ECF 13], which the parties separately briefed [ECF 15, 16].

## **STATEMENT OF THE ISSUES**

1) Did the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, which overruled *Chevron*, implicitly abrogate *Shotz v. City of Plantation*, where the court deferred to agency regulations under step two of the *Chevron* framework and held that public officials may be individually liable under the ADA for retaliation in the "public services context"?

2) Did the district court err in holding that *Shotz* clearly established the law regarding Turner's ADA retaliation claim for qualified immunity purposes where:

    a. The Supreme Court's decision in *Brand X* explained that circuit precedent decided under step two of the *Chevron* framework is "not authoritative" for stare decisis purposes,

    b. The Supreme Court's decision in *Loper Bright* "injected uncertainty" into the holdings of circuit cases decided under step two of the *Chevron* framework,

    c. Every other circuit to consider the question has held that public officials are not individually liable for ADA violations, and

    d. District courts have questioned whether *Shotz* applies when (as here) the defendant's alleged misconduct arises from his position as the plaintiff's supervisor?

2

3) Did Turner plausibly allege protected citizen speech for purposes of her First Amendment retaliation claim when her own allegations show she spoke only internally about compliance and personnel issues within the programs she supervised?

4) Are Smith and Montgomery entitled to qualified immunity given that no clearly established law would have alerted reasonable administrators that reacting adversely to Turner's internal, job-related disclosures about student discipline, grading practices, and staff misconduct violated the First Amendment?

## **INTRODUCTION**

In some ways, this is a typical qualified immunity appeal. The underlying issues are whether the plaintiff has shown a violation of federal law, and whether the law was clearly established at the time of the alleged conduct. The district court below found both elements satisfied and denied qualified immunity. And this Court should reverse if it determines the district court erred at either step, which is ordinarily a straightforward inquiry. But to understand why the district court erred in this case, the Court must wade into murky legal waters where novel questions lurk and circuit splits emerge.

Begin with Appellee Camalyn Turner's ADA retaliation claim, which she asserts against Appellants Matthew Smith and Chelsea Montgomery in their individual capacities. The district court held that *Shotz v. City of Plantation* clearly established the broad principle that public officials are individually liable under the ADA for retaliation in the "public services context," and that every reasonable official in Appellants' position would have known that *Shotz* applies to the facts of this case for qualified immunity purposes. But the district court misunderstood the nature of *Shotz*'s holding.

*Shotz* is a *Chevron* step-two precedent, which means the court did not interpret the ADA's statutory text to clearly impose individual liability. Rather, it found the statute ambiguous and held that an agency regulation interpreting the ADA to

4

provide for individual liability was one permissible reading of the statute. In *Brand X*, the Supreme Court instructed lower courts to treat cases decided at step two (like *Shotz*) as "not authoritative" for stare decisis purposes. So *Shotz* never could have clearly established the law even before *Loper Bright* overruled *Chevron*. After *Loper Bright*, the precedential value of *Chevron* step-two cases like *Shotz* hangs by the thinnest of strands.

This Court should set *Shotz* aside and interpret the statute for itself. Smith and Montgomery enjoy a due process right to have a court of law—not an executive agency—determine their liability under federal law. Every other circuit to consider the question has held that individuals are not liable for ADA violations, thereby creating a lopsided split with the Eleventh Circuit and further weakening *Shotz*'s grip. At the very least, this Court should hold that *Shotz* does not clearly establish the general principle that individuals are liable under the ADA, let alone in this specific factual context. Indeed, reasonable jurists have questioned whether *Shotz* even applies when (as here) the plaintiff is a former employee who was terminated. So *Shotz* did not provide fair notice that Smith's and Montgomery's alleged conduct might give rise to liability, and the district court erred in denying their claim to qualified immunity.

The district court should have dismissed Turner's First Amendment retaliation claim, too. Her allegations show she was a school district administrator responsible

for overseeing the district's discipline processes, student records, and related compliance functions. And the speech her retaliation claim relies on—disclosures about compliance with special education discipline procedures, grading practices at an alternative school, and staff conduct at a holiday party—was made internally, within the district's organizational hierarchy, about the same programs she managed. Under *Garcetti*, that is straightforward employee speech, not citizen speech. The district court had all the facts it needed to make that determination at the pleading stage and should have dismissed the claim.

But even if this Court saw things differently on the merits, qualified immunity still applies. The question for qualified immunity is not whether Turner's speech was in fact protected; it is whether existing precedent would have put reasonable administrators on clear notice that treating her internal, job-related disclosures as employee speech was unconstitutional. On that question, the law is not settled. This Court's precedent recognizes important differences between outward-facing whistleblowing and internal, operations-focused concerns, but its cases do not speak directly to how those principles apply to a manager who reports issues only inside the organization or during an internal investigation. This case resides in that gray area, within which reasonable officials could conclude that Turner was speaking as part of her job. *Lane v. Franks* makes that uncertainty dispositive: without clear notice, qualified immunity applies.

Put simply: the merits are clear, but the notice to Smith and Montgomery was not. Turner's speech was unprotected as a matter of First Amendment doctrine, and even if it were not, no clearly established law made that outcome obvious at the time. The district court's refusal to dismiss the First Amendment claim was error for both reasons.

## STATEMENT OF THE CASE

This case is about a former interim official for the Atlanta Independent School System—also known as Atlanta Public Schools (APS)—who applied for but did not receive a permanent administration position and was terminated. She claims the real reason she didn't get the job was because her supervisors retaliated against her for reporting other employees' misconduct, not because of her objectively poor job performance.

### I.    Statement of Facts

### A. The Parties

Appellants are APS and two of its administrators. Appellant Chelsea Montgomery was an assistant superintendent, and Appellant Matthew Smith was APS's chief performance officer. [Doc. 7 ¶¶ 5–6.]

Appellee Camalyn Turner was an APS employee from January 2021 through September 2023. [*Id.* ¶¶ 7, 36.] During that short time, she served in several roles, including interim director of school supports and initiatives. [*Id.* ¶¶ 6, 9–11.] Turner's official duties included overseeing APS's student-discipline processes and

student assignment records, [*id.* ¶ 11], investigating and reporting discipline-related "compliance issues," [*id.* ¶ 11–13], and staffing the student discipline department, among other things. [*Id.* ¶ 12.] Montgomery and Smith were Turner's supervisors. [*Id.* ¶¶ 5–6.]

### B. Turner's Reports

Turner claims that Appellants retaliated against her for reporting various types of alleged misconduct she witnessed during her tenure at APS. Her reports fall in three buckets. ***First***, Turner allegedly witnessed violations of the Individuals with Disabilities Education Act (IDEA) in the student discipline department and reported those violations to her supervisor and other APS administration officials. [*Id.* ¶¶ 14–18.] ***Second***, Turner claims that she discovered grading-policy violations at Hank Aaron New Beginnings Academy, an alternative school, and reported those violations to supervisor Smith. [*Id.* ¶ 25–27.] ***Third***, Turner alleges that she suspected alcohol consumption at a staff holiday party and reported those suspicions to employee relations during an interview conducted as part of an internal investigation. [*Id.* ¶¶ 19–24.]

### C. The Alleged Retaliation

Turner claims that no APS administration officials, including Montgomery and Smith, took action to correct the misconduct she reported. [*Id.* ¶ 17.] Instead, Turner alleges that, after her reports, Montgomery and Smith retaliated against her

by: blocking Turner from staffing her office or hiring subordinates; subjecting Turner to supervision by Montgomery; transferring Turner to a different role; excluding Turner from the reorganization of the discipline department; harming Turner professionally and personally; "harassment, hostility, and public insults by Montgomery"; and terminating Turner after not selecting her for a permanent position. [*Id.* ¶ 38.]

## II.    District Court Proceedings

Turner filed her Amended Complaint in November 2024, naming APS, Montgomery, and Smith as defendants. [Doc. 7 at 1.][2] Turner asserted four counts, but only two are relevant to this appeal: (1) ADA retaliation claims against APS and Montgomery and Smith in their individual and official capacities [*id.* ¶¶ 48–49]; and (2) First Amendment retaliation claims against APS and Montgomery and Smith in their individual capacities [*id.* ¶ 61].

Appellants moved to dismiss most of Turner's Amended Complaint. [Doc. 11.] Relevant here, Smith and Montgomery moved to dismiss the claims against them in their individual capacities for failure to state a claim and based on qualified immunity. [Doc. 11-1 at 9-17, 19–25.] As to the ADA retaliation claim, they argued

---

[2] She also named Superintendent Bryan Johnson as a defendant in his official capacity, but the district court dismissed those claims as redundant of the claims against APS. [Doc. 19 at 13.]

that (1) Turner failed to state a claim against them because the ADA does not authorize individual liability in the first instance, and (2) qualified immunity applied because their potential liability for ADA retaliation was not clearly established under existing law. [*Id.* at 9–13, 19–25.] For the First Amendment retaliation claim, they argued that (1) Turner failed to state a claim because her reports of alleged misconduct were made pursuant to her official duties and therefore enjoyed no constitutional protection, and (2) qualified immunity barred Turner's First Amendment claim because a reasonable official in Smith's and Montgomery's position could have believed that Turner was speaking as a public employee rather than as a private citizen about a matter of public concern. [*Id.* at 14–17, 19–25.] APS moved to dismiss the First Amendment claim against it for failure to state a claim on the same grounds offered by Smith and Montgomery. [*Id.* at 14–17.]

The district court partially granted and partially denied Appellants' motion to dismiss. [Doc. 19.] Relevant here, the district court declined to dismiss the claims against Smith and Montgomery. Relying on *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161 (11th Cir. 2003), the district court held that Turner stated a retaliation claim against under the ADA, and held that *Shotz* clearly established the law for qualified immunity purposes. [Doc. 19 at 27, 33.] Regarding the First Amendment claim, the district court refused to resolve whether Turner's speech was protected until after discovery. [*See id.* at 36.] It also held that Turner plausibly stated a First

Amendment violation and that the First Amendment's generic prohibition against retaliation clearly established her rights. [*Id.* at 42–43.]

Appellants timely appealed. [Doc. 20.] On motion of the Appellants [Doc. 21], the district court stayed proceedings pending the resolution of this appeal [Doc. 19 at 9].

## STANDARD OF REVIEW

This Court reviews a district court's ruling on a motion to dismiss de novo. *See Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 847 (11th Cir. 2022).

## SUMMARY OF THE ARGUMENT

Qualified immunity protects public officials from suit unless they violate clearly established federal law. The doctrine's clearly-established-law requirement ensures that public officials reasonably may anticipate when their conduct might give rise to liability. To pierce qualified immunity at the motion-to-dismiss stage, the plaintiff must state a claim for a violation of federal law, and must show the law was clearly established at the time. When reasonable people could disagree about the law's application to the specific facts alleged, the law is not clearly established for qualified immunity purposes.

A proper application of these principles mandates reversal. Begin with Turner's ADA retaliation claim against Smith and Montgomery in their individual capacities. The district court relied exclusively on *Shotz v. City of Plantation—*

where the court applied *Chevron* and deferred to DOJ regulations authorizing individual-capacity ADA claims for retaliation in the "public services context"—to satisfy both elements of the qualified immunity inquiry. It held that Turner stated an individual-capacity ADA claim under *Shotz*, and that *Shotz* clearly established the broad principle that individuals are liable for ADA violations. But the district court erred at both steps.

*Shotz* is an anomaly. No other circuit has allowed the DOJ to define the relief available under the ADA. Every other circuit to consider the question has interpreted the ADA for itself and held that individuals are not liable for its breach, creating a lopsided split with *Shotz*. Smith and Montgomery have a due process right for this Court—not the DOJ—to determine whether they are individually liable under the ADA. And the Supreme Court's recent decision in *Loper Bright*, which overruled *Chevron*, provides an opportunity to depart from *Shotz* and correct course.

At any rate, *Shotz* does not clearly establish Smith's and Montgomery's liability in this factual context, nor could it. *Shotz* did not hold that the ADA clearly authorized individual liability; it found that a DOJ regulation recognizing individual liability was one permissible reading of the statute. Even before *Loper Bright*, the Supreme Court's decision in *Brand X* cautioned that step-two *Chevron* precedents like *Shotz* are "not authoritative" for stare decisis purposes. After *Loper Bright*, *Shotz*'s precedential value is even more tenuous. As *Shotz* cannot clearly establish

12

the law as a broad principle, let alone under the facts alleged, the district court should have granted qualified immunity.

The district court should have dismissed Turner's First Amendment claims, too. Her allegations show that she was an APS administrator whose job was to oversee student discipline and student records and identify internal compliance issues within those programs. Each of the three disclosures she relies on—internal reports about IDEA compliance, grading practices at an alternative school, and possible alcohol use at a staff holiday party—was made only inside APS, through supervisory channels or during an internal investigation, relating to the very programs and personnel she was responsible for managing. Under *Garcetti's* employee-speech doctrine, her disclosures were unprotected employee speech, not citizen speech. So her claims against APS, Smith, and Montgomery are not plausible.

In addition, Smith and Montgomery are entitled to qualified immunity. No binding decision clearly established that a central-office administrator engages in protected citizen speech by internally reporting compliance concerns or answering questions in an employer-run investigation. If anything, this Court's cases point the other way. The district court erred by misapplying qualified immunity principles and treating abstract First Amendment concepts as clearly established law. Its refusal to dismiss the First Amendment claims should be reversed.

## ARGUMENT AND CITATIONS OF AUTHORITY

This brief proceeds in two parts. First, we address Smith's and Montgomery's entitlement to qualified immunity from Turner's ADA retaliation claims.[3] Then we explain why the district court should have dismissed the First Amendment retaliation claims against APS, Smith, and Montgomery.

**I.    The district court should have dismissed Turner's ADA retaliation claim against Smith and Montgomery based on qualified immunity.**

Qualified immunity protects public officials from civil liability for damages insofar as their conduct does not violate clearly established federal law. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine's clearly-established-law requirement ensures that public officials reasonably may anticipate when their conduct might give rise to liability under federal law. *See United States v. Lanier*, 520 U.S. 259, 270 (1997).

The Eleventh Circuit has crafted a burden-shifting regime to resolve qualified immunity defenses. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). The defendant must first establish that his alleged misconduct took place within the scope of his discretionary authority. *Id.*[4] The burden then shifts to

---

[3] This Court has never squarely addressed whether public officials are entitled to qualified immunity from individual-capacity ADA retaliation claims, but the district court below found that it does.

[4] Everyone agrees that Smith's and Montgomery's alleged misconduct occurred within the scope of their discretionary authority. [Doc. 19 at 28.]

14

the plaintiff to show that qualified immunity is not appropriate. *Id*. This requires the plaintiff to show (1) the defendant violated federal law, and (2) the law was clearly established. *Id*.

To satisfy the first prong at the motion-to-dismiss stage, Turner must state a claim for a violation of federal law. *See Keating v. City of Miami*, 598 F.3d 753, 760 (11th Cir. 2010). Under the second prong, Turner may show that the law is clearly established in one of three ways. *Gilmore v. Georgia Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025). She may (1) point to materially indistinguishable binding precedent[5] holding the defendant's specific conduct unlawful, (2) identify a broader principle in case law that clearly applies to the facts of the case, or (3) show that the defendant's misconduct was obviously unlawful even in the total absence of case law. *Id*. Failure to satisfy either element entitles the defendant to qualified immunity. *Pearson*, 555 U.S. at 236. And courts have discretion to grant immunity at either step. *Id*.

Relying exclusively on *Shotz v. City of Plantation, Fla*., 344 F.3d 1161 (11th Cir. 2003), the district court found both prongs of the qualified immunity inquiry satisfied regarding Turner's ADA claim. [Doc. 19 at 27 ("[U]nder *Shotz*, Plaintiff

---

[5] Only binding authority may clearly establish the law. But persuasive authority may show the law is not clearly established. *Corbitt v. Vickers*, 929 F.3d 1304, 1319 n. 14 (11th Cir. 2019).

has adequately alleged a violation of federal law to sustain her individual ADA retaliation claims under Rule 12(b)(6)."); *id*. at 33 ("given the clarity of the Eleventh Circuit's governing decision in *Shotz*, the Court finds that the Individual Defendants are not shielded from Plaintiff's ADA retaliation claims by qualified immunity.").] This Court should reverse.

## A. This Court should depart from *Shotz* and hold that public officials are not individually liable for retaliation under the ADA.

The statutory text and structure indicate that Congress did not intend to make individuals liable for ADA violations. Although *Shotz* approved individual-capacity retaliations claims in the public services context by deferring to DOJ regulations under *Chevron*, the Supreme Court's decision in *Loper Bright* overruled *Chevron* and undermined *Shotz* to the point of abrogation. This Court should depart from *Shotz*, examine the text with fresh eyes, and hold that individuals are not liable for this statutory offense.

### 1. The statutory text and structure preclude individual liability for any ADA violation, including retaliation in the public services context.

Only Congress may create remedies for violations of federal law. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Executive agencies cannot "conjure up" remedies "that have not been authorized by Congress." *Id*. at 291. And the courts cannot craft judicial remedies "to make effective the congressional purpose expressed by a statute." *Id*. at 287. "The judicial task" for determining the

16

scope of available relief under federal law is simple: "interpret the statute Congress passed." *Id*. at 286. To fulfill this duty, courts must look to the statutory text and structure to find the "best reading of the statute." *Loper Bright*, 603 U.S. at 400. The statutory text and structure indicate that Congress did not intend to impose individual liability on public officials for any ADA violation, including retaliation in the public services context.

The ADA consists of several subchapters or "titles." Titles I-III are the antidiscrimination provisions. Title I prohibits "employers" from discriminating based on disability in the "employment" context. *See* 42 U.S.C. §§ 12111 *et seq*. Title II proscribes "public entities" from discrimination in the "public services" context. *Id.* §§ 12131 *et seq.* And Title III precludes discrimination in "public accommodations." *Id.* §§ 12181 *et seq.* Title V is the ADA's antiretaliation subchapter. It forbids any "person" from retaliating against an "individual" for opposing conduct made unlawful by Titles I-III in each respective context. *See* 42 U.S.C. § 12203(a).

Each title incorporates a remedial scheme from a different Civil Rights Act (CRA) statute in a "cascade of cross-references." *United States v. Florida*, 938 F.3d 1221, 1229 (11th Cir. 2019). Title I incorporates CRA Title VII's remedies; Title II incorporates CRA Title VI's remedies; Title III incorporates CRA Title II's remedies; and Title V incorporates the remedies from Titles I-III for retaliation in

each respective context. *G. v. Fay Sch.*, 931 F.3d 1, 10 (1st Cir. 2019). Since none of the remedial schemes incorporated by Titles I-III authorizes individual liability, it follows that Congress did not intend to make individuals liable for discrimination under Titles I-III. *See Albra*, 490 F.3d at 834 (holding no individual liability for discrimination in employment context); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (same in public services context); *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) (same in public accommodations context). And because Title V incorporates the same remedies as Titles I-III, it follows that "individual employees cannot be held liable under the ADA's retaliation provisions," either. *See Yerdon v. Poitras*, 120 F.4th 1150, 1155–56 (2d Cir. 2024); *see also Albra*, 490 F.3d at 833–834 (holding no individual liability for retaliation in employment context); *Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999) (same in public services context); *Fay*, 931 F.3d at 10–11 (same in public accommodations context).

A straightforward application of the statutory text leads to the inevitable conclusion that Turner lacks an individual-capacity remedy against Smith and Montgomery. For claims alleging retaliation in the "public services context," Title V incorporates the remedies from Title II, which incorporates the remedies from § 504 of the Rehabilitation Act, which (in turn) incorporates the remedies from Title VI of the CRA. Because the Rehabilitation Act and Title VI are "spending clause

legislation," they may impose liability only on the recipients of federal funding, not individuals. *See generally Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999). And because Title VI's remedies govern claims alleging retaliation in the public services context, the statutory text indicates that Congress did not intend for individuals to be liable for this statutory offense. *See Key v. Grayson*, 163 F. Supp. 2d 697, 704 (E.D. Mich. 2001) (collecting cases).

Enter *Shotz*. Rather than follow the straightforward textual analysis set forth above, "[t]he *Shotz* court chose a more complicated route." *N.T. v. Espanola Pub. Sch.,* No. CIV 04-0415 MCA/DJS, 2005 WL 5840479, at *12 (D.N.M. May 20, 2005). *Shotz* relied on *Chevron*, which created a two-step framework for interpreting statutes administered by federal agencies. Under *Chevron*'s first step, courts assess "whether Congress has directly spoken to the precise question at issue." *Loper Bright*, 603 U.S. at 379. If congressional intent is clear, "that is the end of the inquiry." *Id*. If congressional intent is ambiguous, however, the court must proceed to *Chevron*'s second step and ask whether the agency's interpretation is "based on a permissible construction of the statute." *Id*. If so, *Chevron* directed courts to defer to the agency regulation. *Id*.

At step one, *Shotz* found congressional intent ambiguous on the issue of individual liability due to a perceived conflict between § 12203(a)'s substantive provision—which *Shotz* interpreted to apply to individuals—and § 12203(c)'s

remedial provision—which does not. 344 F.3d at 1178. Proceeding to step two, *Shotz* looked to a DOJ regulation interpreting the ADA to authorize individual liability for retaliation in the public services context and found the regulation to be a permissible construction. *Id*. at 1180. By expressly declining to resolve the purported ambiguity for itself, *Shotz* made clear that *Chevron* deference formed the sole basis of its holding. *See id*. at 1177 & n. 23 ("[W]e follow the customary route of relying on authoritative agency regulations. As such, we need not decide how we would have come out absent the regulation.").

*Shotz* committed a series of missteps. It found statutory ambiguity where none exists; it deferred to agency regulations without a proper delegation of congressional authority; *see Albra*, 490 F.3d at 833 n. 6 (explaining Congress did not authorize any agency to implement the ADA's generally applicable provisions); and it casually dismissed the constitutional limitations on spending clause legislation remedies by simply stating that the ADA is itself not a spending clause statute—a position roundly rejected by both the Supreme Court and this Court. *See Fla.*, 938 F.3d at 1242 (citations omitted).[6]

---

[6] Appellants note that the Supreme Court recently held oral arguments in *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 145 S. Ct. 2814 (2025), which raises the question whether public officials may be individually liable for damages under spending clause legislation. *See* Oral Argument Transcript, available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/23-1197_c07d.pdf.

To be sure, this is not enough, by itself, to depart from *Shotz*. Under this Court's horizontal precedent rule, *Shotz* remains binding precedent until its holding is overruled or "undermined to the point of abrogation" by the Supreme Court or the Eleventh Circuit sitting en banc. *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998). To undermine panel precedent to the point of abrogation, the intervening decision must be "clearly on point" and "clearly contrary" to the panel precedent's holding. *Jennings v. Sec'y, Fla. Dep't of Corr.*, 108 F.4th 1299, 1304 (11th Cir. 2024). And it must "eviscerate" the panel decision's "fundamental props." *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022). *Loper Bright* meets those criteria.

## 2. *Loper Bright* has undermined *Shotz* to the point of abrogation.

In *Loper Bright*, the Court overruled *Chevron* and forbade lower courts from "defer[ring] to an agency interpretation of the law simply because a statute is ambiguous." 603 U.S. at 413. Instead, courts must "exercise independent judgment in determining the meaning of statutory provisions." *Id*. at 394. Because *Loper Bright* is "crystal clear that we must no longer grant deference to an executive agency's interpretation of the law…[c]ircuit precedent that relies on *Chevron* to defer to an agency's interpretation of the law is 'clearly irreconcilable' with *Loper Bright*." *Lopez v. Bondi*, 151 F.4th 1196, 1199 (9th Cir. 2025) (Bumatay, J., dissenting). Put differently, *Loper Bright*'s holding is "clearly on point" and "clearly

contrary" to *Shotz*.

*Loper Bright* also eviscerates *Shotz*'s fundamental prop. An intervening decision "eviscerates" a panel decision's fundamental props when it negates each basis for the panel's holding. *See United States v. Petite*, 703 F.3d 1290, 1299 (11th Cir. 2013) (holding that intervening Supreme Court decision eviscerated both fundamental props of panel decision), *abrogation on other grounds recognized by United States v. Ford*, 649 F. App'x 756, 760 (11th Cir. 2016); *cf. Del Castillo*, 26 F.4th at 1223 (holding that panel precedent remained binding because it "rests on two bases, only one of which has been rejected by the Supreme Court while the other basis has not").

*Shotz* has one fundamental prop: *Chevron*. By expressly declining to interpret the statute for itself, the *Shotz* court made clear that deference to the DOJ's regulations formed the sole basis of its decision. 344 F.3d at 1177 & n. 23. This distinguishes *Shotz* from other *Chevron*-based precedents that survive *Loper Bright* because the court provided alternative reasons for its decision and would have reached the same result absent agency deference. *Cf. Ponce v. U.S. Att'y Gen.*, 141 F.4th 1214, 1216 (11th Cir. 2025) (refusing to revisit *Chevron*-based circuit precedent because the prior panel would have reached the same result without the agency's interpretation).

That *Loper Bright* satisfies this Court's horizontal-precedent rule would

ordinarily end the discussion. But *Loper Bright* cabined its ruling in a way that has vexed lower courts:

> [W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory stare decisis despite our change in interpretive methodology… Mere reliance on *Chevron* cannot constitute a " 'special justification' " for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, "just an argument that the precedent was wrongly decided."

603 U.S. at 412 (citations omitted).

The Court did not indicate whether its statutory stare decisis dicta applied to *Chevron*-based circuit authority. *See Tennessee v. Becerra*, 131 F.4th 350, 365 (6th Cir. 2025) ("Unremarked upon was whether statutory stare decisis includes Circuit court precedent."). Unsurprisingly, the "circuits have already split on how to treat *Chevron* holdings" after *Loper Bright*. *See Ozurumba v. Bondi*, 153 F.4th 396, 406 (4th Cir. 2025) (collecting cases).

Some courts take a categorical approach, holding that *Loper Bright* preserves all cases decided under *Chevron*. *See Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024) (holding *Chevron* case law "remains precedential authority that binds us"). Others take the opposite tack, holding that *Loper Bright* preserves only the Supreme Court's precedents but abrogates Chevron-based circuit authority. *See Quito-Guachichulca v. Garland*, 122 F.4th 732, 735 (8th Cir. 2024) (holding that circuit precedent deferring to agency interpretations of law "did not survive *Loper*

*Bright*"); *Bondi*, 151 F.4th at 1208 (Bumatay, J., dissenting) ("*Loper Bright*'s statement about 'prior cases' refers to *its* prior cases—not [circuit cases]."); *Harding v. Steak N Shake, Inc.*, 745 F. Supp. 3d 571, 583 (N.D. Ohio 2024) ("these [circuit] decisions and their reliance on *Chevron* are no longer good law").

Still others take a nuanced approach, suggesting that *Loper Bright* preserves only those circuit precedents decided under *Chevron*'s first step, but not its second step. *See Becerra*, 131 F.4th at 366 n. 7. Under this approach, "statutory stare decisis attaches to [*Chevron*-based circuit] cases interpreting statutes … only when such prior decisions were based on a finding that the terms of the statute were unambiguous and therefore left no room for agency discretion." *Id.* (citing *Nat'l Cable and Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005)). But circuit authority deferring to an agency's interpretation of law under *Chevron* step two—where congressional intent is ambiguous—is not entitled to precedential weight. *Id.*

The issue remains open in many jurisdictions, including the Eleventh Circuit. *See Coleman v. Child.'s Hosp. of Philadelphia*, No. 23-3064, 2024 WL 4490602, at *3 n.4 (3d Cir. Oct. 15, 2024); *Ponce*, 141 F.4th at 1216 n. 4 ("we need not address the stare decisis effect of our prior decisions deferring to the BIA's interpretation").[7]

---

[7] Judge Newsom and Judge Marcus recently offered divergent views of *Loper Bright*'s impact on *Chevron*-based circuit precedent in *Bastias v. U.S. Att'y Gen.*, ___F.4th___, 2025 WL 3029701, at *6-25 (11th Cir. 2025). Judge Newsom contends

For the reasons discussed below, this Court should hold that *Loper Bright*'s statutory stare decisis dictum was intended to preserve only Supreme Court precedents, not circuit precedent. In the alternative, the Court should hold that *Loper Bright* preserves only those circuit cases decided under step one of the *Chevron* framework, not step two.

Begin with the antecedent question: whether *Loper Bright*'s limiting language applies to circuit precedent in the first instance. Three clues in the opinion suggest the answer is no. First, the exemplar case that *Loper Bright* cites for the idea that *Chevron*-based precedent retains its precedential authority is *Chevron* itself, which is a Supreme Court case.

The second clue is *Loper Bright*'s use of the phrase "special justification for overruling such a holding," which references the stare decisis test the Supreme Court applies to its own cases. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014) ("Before overturning a long-settled precedent, however, we require 'special justification,' not just an argument that the precedent was wrongly decided."). No "special justification" is necessary to depart from lower court

---

that *Loper Bright* preserves precedent upholding agency interpretations of a statute, while Judge Marcus contends that *Loper Bright* preserves only the "case-specific application of that interpretation to the facts before it." *Id*. Neither addressed whether *Loper Bright*'s dicta applies to circuit precedent in the first instance, let alone circuit precedent decided under *Chevron* step two.

precident;[8] mere incompatibility with intervening high court precedent is reason enough.

The third clue is *Loper Bright*'s invocation of *statutory* stare decisis. The Supreme Court has never determined whether circuit precedents are entitled to statutory stare decisis. And at least one sitting justice says they aren't. *See* Amy Coney Barrett, *Statutory Stare Decisis in the Court of Appeals*, 73 Geo. Wash. L. Rev. 317, 317-318 (2005). That's because the assumption justifying statutory stare decisis—*i.e.*, that Congress is aware of statutory precedents and therefore its failure to correct them implies acquiescence—does not hold true for circuit precedent. Congress ordinarily is unaware of what the circuits are doing. *See Bondi*, 151 F.4th at 1210 (Bumatay, J., dissenting and collecting studies). So Congress's failure to correct a circuit court's statutory precedent, then, does not imply congressional approval. *Id*. Nor does a circuit court decision, which is necessarily limited in geographic scope, provide an incentive for Congress to kickstart the legislative process. *See Barrett*, 73 Geo. Wash. L. Rev. at 344. So it's a stretch to assume that *Loper Bright* intended its statutory stare decisis dictum to preserve circuit cases decided under the *Chevron* framework.

---

[8] Although no "special justification" is needed to overrule a circuit precedent, a special justification supports overruling *Shotz*. In violation of bedrock separation-of-power principles, *Shotz* allowed the DOJ to conjure up a remedy under Title V, even though Congress never gave the DOJ authority to implement or interpret Title V, let alone create a judicial remedy.

In the alternative, this Court should hold that circuit cases resolved under *Chevron*'s first step—where congressional intent is unambiguous—remain binding, but cases decided under *Chevron*'s step two are not. This conclusion is consistent with the Supreme Court's own understanding of how stare decisis applies to *Chevron* precedents.

In *Brand X*, the Supreme Court addressed the "confusion in the lower courts over the interaction between the *Chevron* doctrine and stare decisis principles." 545 U.S. at 985. The Court held that *Chevron*-based precedent is entitled to stare decisis only when decided under the "demanding *Chevron* step one standard"—*i.e.*, when the court determines the statute is unambiguous. *Id*. at 982–983. Circuit law interpreting "an ambiguous statute an agency is charged with administering"—under *Chevron* step two—"is not authoritative" and therefore not entitled to statutory stare decisis. *Id*. at 983; *see also Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1150 (10th Cir. 2016) (Gorsuch, J., concurring). *Brand X* weakened the stare decisis effect of step-two precedent to provide agencies with breathing room to change their interpretations of law from time to time without running headlong into contrary precedent. *Id*. Because Congress has no incentive to correct statutory precedents that lack stare decisis effect, *see* Barrett, 73 Geo. Wash. L. Rev. at 317–318, its failure to correct circuit precedents decided under *Chevron* step two does not necessarily imply approval of those holdings. To the extent *Loper Bright*'s limiting language

27

concerns circuit precedent in the first instance, it would not apply to circuit precedent decided under *Chevron* step two.[9]

Consider the alternative. A post-*Loper Bright* world in which courts treat as sacrosanct circuit precedent deferring to an agency's interpretation of a statute would create arbitrary and absurd results. Pre-*Loper Bright*, agencies had flexibility to change their interpretations of a statute because circuit precedents decided under *Chevron* step two were not binding. *See Brand X*, 545 U.S. at 985. If *Loper Bright* traps circuit precedent in amber, as the district court suggested, then "we would be stuck—forever—with the most recent agency interpretation that we upheld before *Loper Bright*," which "strikes us as arbitrary." *Ozurumba*, 153 F.4th at 406. Other courts note the "absurdity" of weaponizing *Loper Bright*'s dicta to undermine its holding. *See Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, ___ F. Supp. 3d ___, No. CV 24-86-M-DWM, 2025 WL 2223573, at *14 (D. Mont. Aug. 5, 2025) (explaining that courts should not apply *Loper Bright*'s statutory stare decisis dicta to "perpetuate *Chevron* deference in defiance of *Loper Bright*'s central holding that it is the courts, not the agencies, that must engage in statutory

---

[9] Lower courts agree that *Brand X* weakens the statutory stare decisis effect of *Chevron* precedents decided under step two. *See Metro. Hosp. v. U.S. Dep't of Health & Hum. Servs.*, 712 F.3d 248, 258 (6th Cir. 2013); *Dominion Energy Brayton Point, LLC v. Johnson*, 443 F.3d 12, 17 (1st Cir. 2006); *cf. Empire Health Found. for Valley Hosp. Med. Ctr. v. Azar*, 958 F.3d 873, 886 (9th Cir. 2020), *rev'd on other grounds by Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.,* 597 U.S. 424 (2022).

interpretation.").

Under these principles, the statutory stare decisis principles invoked by *Loper Bright* do not preserve *Shotz*'s holding. Even assuming *Loper Bright*'s dictum applies to circuit precedent, it would not preserve step-two precedents like *Shotz*, which were never entitled to "authoritative" weight in the first place. This Court should interpret the ADA with fresh eyes and hold that public officials are not liable for ADA violations.

### B. *Shotz* does not clearly establish Smith and Montgomery's liability for qualified immunity purposes, nor could it.

Below, Smith and Montgomery argued that existing law did not clearly establish their liability for the cause of action Turner alleges. The district court rejected that argument on two grounds. First, the district court held that a defendant's potential liability is irrelevant to the "clearly established law" question. [Doc. 19 at 30]. According to the district court, only the plaintiff's rights and the unlawfulness of the defendant's conduct need be clearly established, not the defendant's potential liability. [Doc. 19 at 30].

Second, the district court held that *Shotz* clearly established the general principle that public officials may be individually liable for retaliation in the public services context such that every reasonable official in Appellants' position would have known that *Shotz* applies to this case. [*Id.*] The district court is wrong on both counts.

29

**1. Qualified immunity applies when existing law does not clearly establish a defendant's potential liability under the cause of action alleged.**

Recall that qualified immunity's purpose is to ensure that public officials "reasonably can anticipate when their conduct may give rise to liability." *See Davis v. Scherer*, 468 U.S. 183, 194 (1984). When existing law does not clearly establish liability under the statutory cause of action alleged, an official could not possibly anticipate that her conduct "may give rise to liability" under that statute. *See id.* at 194 & n.12. It follows that qualified immunity applies when the defendant's "potential liability" is not clearly established for the cause of action alleged. *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017).[10]

---

[10] The district court's overly-cramped view of the clearly-established-law inquiry conflicts with the Supreme Court's qualified-immunity jurisprudence, which applies broadly to any "issue" that is "central to the cause of action alleged," *Ziglar*, 582 U.S. at 154, including:

- the plaintiff's rights, *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("our cases establish that the right the official is alleged to have violated must have been clearly established");
- the elements of the plaintiff's claim, *see Reichle v. Howards*, 566 U.S. 658, 663 (2012) (asking whether existing law clearly established that "a First Amendment retaliatory arrest claim may lie despite the presence of probable cause");
- the relevant legal principle, *see District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.");
- the unlawfulness of the defendant's conduct, *see Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question is whether the violative nature of particular conduct is clearly established"); and
- the defendant's "potential liability" under the specific statutory cause of action alleged. *See Ziglar*, 582 U.S. at 152.

Long before *Ziglar*, the circuits held that qualified immunity applies when a defendant's liability is not clearly established for the cause of action alleged. Those cases generally fit in two buckets. ***First***, courts grant qualified immunity when existing law does not clearly establish whether public officials are ever liable for violating the specific statutory or constitutional provisions. ***Second***, qualified immunity applies when the defendant's liability is questionable in the particular factual scenario presented.

Start with the first bucket. A defendant is entitled to qualified immunity when existing law does not clearly establish whether public officials are *ever* individually liable for the statutory or constitutional violation alleged. *See Modica v. Taylor*, 465 F.3d 174 (5th Cir. 2006); *Sterling Hotels, LLC v. McKay*, 71 F.4th 463 (6th Cir. 2023). Take *Modica*, for example. There, the plaintiff sued a public official for alleged violations of the Family and Medical Leave Act in his individual capacity, and the defendant claimed qualified immunity. 465 F.3d at 188. The Fifth Circuit noted that "individual public employee liability is a subject of much debate among the courts of appeals." *Id*. In light of that split, "it was not clearly established that public employees are subject to individual liability under the FMLA," and qualified immunity applied. *Id*.

Next, consider *Sterling Hotels*, where the plaintiff asserted a regulatory takings claim under the Fifth Amendment and the defendant raised qualified

immunity. 71 F.4th at 468. The court noted that existing law did not clearly establish "whether an officer could be liable for a taking in his individual capacity" under the Fifth Amendment. *Id*. Because "potential individual liability for a regulatory takings claim was not clearly established," the defendant was entitled to qualified immunity. *Id*.; *see also Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1375 (8th Cir. 2022) (same). Under this line of cases, qualified immunity applies when existing law does not clearly establish whether the violation of a particular federal law ever gives rise to individual liability.

In the second bucket, circuit courts grant qualified immunity when the defendant's potential liability is questionable in the particular factual scenario presented. For example, qualified immunity is appropriate when existing law does not clearly establish:

• Whether the defendant holds a senior-enough position to be held liable for adverse employment actions. *See Atkins v. Hopkins*, 137 F.4th 286, 290 (5th Cir. 2025) (granting qualified immunity because "conflicting caselaw had cast doubt on whether non–final decision-makers could be liable for unlawful conduct that ultimately results in termination"); *Woodward v. City of Worland*, 977 F.2d 1392, 1402–03 (10th Cir. 1992) ("It is not clearly established… that someone other than a supervisor … can be held liable for constructive discharge in violation of the Due Process Clause of the Fourteenth Amendment.").

- Whether the plaintiff belongs to the class of persons (or entities) to whom the defendant may be liable. *See Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1346 (11th Cir. 2013) (granting qualified immunity because "the law is not clearly established that a government employer can be held liable for retaliation against a policymaking or confidential employee for speech about policy") (cleaned up); *Sheba Ethiopian Rest., Inc. v. DeKalb Cnty., Georgia*, No. 21-13077, 2023 WL 3750710, at *10 (11th Cir. June 1, 2023) ("The officials are entitled to qualified immunity because there was no law clearly establishing that they could be held liable under section 1981 for discriminating against a corporation based on its race."); *Cunningham v. Gates*, 229 F.3d 1271, 1293 (9th Cir. 2000) ("Because it was not clearly established that City attorneys could be held liable to future plaintiffs based on their indemnification recommendations in excessive force cases, we hold that the City attorneys are entitled to qualified immunity from suit.").

- Whether the plaintiff's theory of liability extends to a new factual context. *See Hall v. Thomas*, 190 F.3d 693, 697 (5th Cir. 1999) (granting qualified immunity because "defendants could not reasonably have known that their actions might incur liability under the ADA" in the "prison context"); *Fisher v. Moore*, 73 F.4th 367, 371 (5th Cir. 2023) ("Appellants … are entitled to qualified immunity because the state-created danger theory of liability was not clearly established in this circuit when the underlying events occurred.").

This case falls in both buckets. For the reasons discussed below, *Shotz* does not clearly establish (1) whether public officials may *ever* be individually liable for ADA violations, and (2) whether Smith and Montgomery are individually liable in this factual context.

### 2. *Shotz* does not amount to clearly established law for qualified immunity purposes.

*Shotz*'s holding is too tenuous to clearly establish the law for qualified immunity purposes. Even before *Loper Bright*, it was unlikely that circuit authority decided under step two of the *Chevron* framework (like *Shotz*) could clearly establish the law. Indeed, appellants are unable to find any decision relying on a *Chevron* step-two precedent as clearly established law. And for good reason. Step-two precedents do not definitively state what the law is; they merely indicate than an agency's interpretation of a statute is one permissible way to read it. *Brand X* directed lower courts to treat this precedent as "not authoritative" for stare decisis purposes. 545 U.S. at 983. It makes little sense to say that non-authoritative precedent could clearly establish the law.

At any rate, *Loper Bright* has injected uncertainty into *Shotz*'s holding such that a reasonable official could question whether *Shotz* remains good law. *See Reichle*, 566 U.S. at 670. The Supreme Court has explained that circuit precedent cannot clearly establish the law when intervening Supreme Court authority "injects uncertainty" into that precedent. *Id*. In *Reichle*, the Tenth Circuit denied qualified

34

immunity, holding that one of its own precedents—*DeLoach v. Bevers*, 922 F.2d 618 (1990)—clearly established the law. 566 U.S. at 666. But the Supreme Court disagreed, noting that its intervening decision in *Hartman v. Moore*, 547 U.S. 250 (2006), cast doubt on *DeLoach*'s precedential value. 566 U.S. at 666–667. Although *Hartman* did not overrule or abrogate *DeLoach*, it "injected uncertainty" into *DeLoach*'s holding such that a reasonable official could doubt whether *DeLoach* remained good law. *Id.* at 670. After *Hartman*, *DeLoach* could not clearly establish the law, and qualified immunity applied. *Id.*; *see also WBY, Inc. v. Dekalb Cnty.*, No. 1:14-CV-0253-LMM, 2016 WL 3128397, at *7 (N.D. Ga. Jan. 13, 2016), *aff'd sub nom. WBY, Inc. v. DeKalb Cnty., Georgia*, 695 F. App'x 486 (11th Cir. 2017) ("the Eleventh Circuit has retreated or attempted to retreat from its holding [in *Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007)] to such an extent that it can no longer constitute clearly established law").

Intervening authority has injected uncertainty into *Shotz*'s holding. Two years after *Shotz*, *Brand X* held that step-two precedents like *Shotz* are "not authoritative." Later, this Court's decision in *Albra* pointed out that Congress never authorized the DOJ to implement Title V thereby calling *Shotz*'s reliance on DOJ regulations into question. And *Loper Bright* further undermined *Shotz* by overruling *Chevron*. To be fair, no court has yet held that *Loper Bright* has abrogated *Shotz*. But *Reichle* does not demand so much. It's enough to say that a reasonable official could doubt

35

whether *Shotz* remains good law. And many judges have concluded that *Chevron*-based circuit precedent (like *Shotz*) is no longer binding. *See Bondi*, 151 F.4th at 1208 (Bumatay, J., dissenting); *Harding*, 745 F. Supp. 3d at 583. Even if *Loper Bright* did not abrogate *Shotz* for purposes of the horizontal precedent rule, it's undeniable that *Loper Bright* has "injected uncertainty" into *Shotz*'s holding for qualified immunity purposes.

The lopsided circuit split that emerged in *Shotz*'s wake confirms the point. Every other circuit to consider the question has held that individuals are not liable under the ADA. *See*, *e.g.*, *Brown v. Monsalud*, No. 24-1555, 2025 WL 2803768, at *2 (3d Cir. Oct. 2, 2025) ("there is no individual liability for damages under the ADA"). And the Supreme Court has been crystal clear that one circuit's precedent cannot clearly establish the law when sister circuits are divided. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").

Although the district court categorically rejected the idea that a circuit split bears any relevance to the clearly-established-law inquiry, the Supreme Court disagrees. *See id.* (holding "a split among the Federal Circuits" entitles defendant to qualified immunity); *Ziglar*, 582 U.S. at 154 ("the fact that the courts are divided … demonstrates that the law on the point is not well established"); *Pearson*, 555 U.S.

at 245 (holding that "a Circuit split on the relevant issue" shows the law is not clearly established). If circuit splits matter to the Supreme Court, they necessarily matter to lower courts, too.

In sum, *Shotz* does not clearly establish the broad principle that public officials may be liable for retaliation in the public services context under Title V of the ADA. And, at any rate, *Shotz* is factually distinguishable enough to doubt its application to our factual context.

### 3. A reasonable official could doubt whether *Shotz* applies in this factual context.

The Supreme Court has explained that "clearly established law" must be "particularized to the facts of the case," not defined in general or abstract terms. *White v. Pauly*, 580 U.S. 73, 79 (2017). The law is only clearly established if every reasonable official in the defendant's position would have understood how the law applies to the facts alleged. *Id.*

The broad principle announced in *Shotz*— that individuals may be liable for retaliation in the "public services context" under Title V—does not clearly apply to the facts of this case. Recall that *Albra* categorically precludes individual liability under the ADA for retaliation in the "employment context." The line between the "employment" and "public services" contexts is hazy when (as here) the plaintiff is a former employee of a public entity. Indeed, district courts have expressed difficulty in determining whether *Shotz* or *Albra* should apply when the plaintiff was

37

terminated in retaliation for complaining about discrimination in public services. *See Gadjiev v. Atlanta Indep. Sch. Sys.*, No. 1:12-CV-2700-JEC, 2013 WL 5349854, at *5 (N.D. Ga. Sept. 23, 2013) ("Whether that places this case in the *Albra* block, because the plaintiff was an employee who was fired, or the *Shotz* category, because the plaintiff was complaining about the denial of a public service to those allegedly protected under the Acts, the undersigned does not know for sure. One might reasonably suspect that employment is employment and, if that is so, probably *Albra* should control.").[11]

If judges have trouble deciding whether *Shotz* would apply to retaliation in a hybrid employment/public services context like the one presented here, a reasonable official in Smith's and Montgomery's position could be forgiven for making the same mistake. The Supreme Court created qualified immunity doctrine for cases like

---

[11] *See also Sobel v. St. Mary's Hosp. & Med. Ctr., Inc.*, No. 21-CV-00971-MEH, 2021 WL 5736438, at *7 (D. Colo. Dec. 2, 2021) ("The unique facts of this case present a different question of whether *Shotz* would be applicable. In *Shotz*, no employment relationship was ever implicated. Here, there is no dispute that an employment relationship existed. It is an open question whether [*Shotz* would apply to] a case like this, in which there are both employment and public services aspects."); *Datto v. Univ. of Miami*, No. 18-CV-21053, 2020 WL 7344680, at *5 (S.D. Fla. July 23, 2020), *report and recommendation adopted in relevant part*, No. 18-CV-21053, 2020 WL 6389987 (S.D. Fla. Nov. 2, 2020) ("*Shotz* is distinguishable in that the claims were brought against a local municipality for retaliation 'which occurred outside the employment context,' and here Plaintiff's claims against Pearse stem from Pearse's purported misconduct in his capacity as Plaintiff's direct supervisor while Plaintiff was employed at the University.").

this one.

***

In sum, the district court misapplied both prongs of the qualified immunity analysis. Turner has not stated an individual-capacity ADA retaliation claim against Smith and Montgomery, nor could she given that Congress has not authorized that remedy and *Loper Bright* has undermined *Shotz* to the point of abrogation. And *Shotz* does not clearly establish individual liability as a general principle, let alone in this factual context involving both and public services and employment aspects. Accordingly, this Court should reverse the district court's judgment and grant qualified immunity.

## II. The district court erred by not dismissing Turner's First Amendment claims.

The district court should have dismissed Turner's First Amendment retaliation claims. Turner needed to allege that she spoke *as a private citizen*, but her allegations confirm she spoke *as an employee*. Each disclosure she relies on was made internally, to APS officials, about the operations or personnel she was responsible for managing. Under *Garcetti*, that is unprotected employee speech. For that reason, Turner's retaliation claims are not plausible, and the district court erred by not dismissing them.

Even if Turner had pled a plausible First Amendment claim against APS, Smith and Montgomery are still entitled to qualified immunity. No precedent put

39

Smith or Montgomery on notice that their alleged conduct toward Turner was unlawful. The district court reached the opposite conclusion by misapplying fundamental qualified-immunity principles. Those errors should be corrected.

### A. Turner's First Amendment claims fail under Rule 12(b)(6) because she did not plausibly allege that she spoke as a private citizen.

A plaintiff alleging First Amendment retaliation must show she engaged in constitutionally protected speech. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015). That showing has two elements: (1) the employee spoke as a private citizen, and (2) her speech addressed a matter of public concern. *Id*. Turner's First Amendment retaliation claim falters on the first element.

### 1. Under *Garcetti*, speech made pursuant to an employee's job duties is not constitutionally protected.

Under *Garcetti v. Ceballos*, speech made "pursuant to" an employee's "official duties" is not citizen speech protected by the First Amendment. 547 U.S. 410, 421 (2006). As a result, an employer may lawfully restrict workplace speech "that owes its existence to a public employee's professional responsibilities." *Id.* The inquiry into the scope of an employee's duties is a "practical one," focusing on the day-to-day realities of the job rather than rigid job descriptions. *Id*. at 424.

A disclosure's "content, form, and context" determine whether it is citizen or employee speech. *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1284–85 (11th Cir. 2009). Several considerations guide that analysis: whether the speech occurred

entirely in the workplace; whether it addressed the employee's working environment or departmental functions; and whether the employee intended to raise public awareness. *See, e.g.*, *Alves v. Bd. of Regents*, 804 F.3d 1149, 1161 (11th Cir. 2015); *Boyce v. Andrew*, 510 F.3d 1333, 1344–45 (11th Cir. 2007).

Two cases—*Alves* and *Phillips*—illustrate this functional analysis. Both cases teach the same lesson: internal, operation-related reporting by employees with oversight responsibilities is typically employee speech.

In *Alves*, five clinical psychologists spoke as employees—not citizens—when they complained internally about their clinical program's leadership and practices. 804 F.3d at 1154–57. Their job descriptions did not expressly require them to report their supervisor or critique their employer's operations, so this Court examined their *actual* responsibilities: supervising trainees and staff, coordinating and evaluating clinical services, and managing key programs. *Id.* at 1154–55, 1164–65. Because their internal complaints challenged operational practices tied to their supervisory and clinical duties, this Court held the speech "owed its existence" to their ordinary responsibilities. *Id.* at 1164–65.

In *Phillips v. City of Dawsonville*, a city clerk and treasurer spoke as an employee when she internally reported the mayor's misuse of city resources and potential sexual harassment. 499 F.3d 1239, 1241–42 (11th Cir. 2007). This Court emphasized that her duties included overseeing the city's funds and keeping officials

41

apprised of the city's finances. *Id.* at 1242. Because her disclosures "touch[ed] on a misuse of City resources," and it was "within her official duties to inquire about and make statements on the potentially inappropriate use of the City resources," the Court held she spoke pursuant to her oversight duties, even though her job description did not require her speech. *Id.* at 1242–43.

### 2. Turner's speech was not protected under *Garcetti*.

Against that backdrop, Turner's allegations do not describe a government official speaking as a private citizen. They show a high-level administrator addressing legal compliance and personnel concerns within the same departments she managed. That is quintessential employee speech.

After her initial hire, Turner was eventually elevated to Interim Executive Director of School Supports and Initiatives. [Doc. 7 ¶ 11.] In this position, she oversaw student discipline and student assignment and records. [*Id.*] She also worked to staff the Student Discipline Office. [*Id.* ¶ 12.] Her responsibilities included investigating and reporting discipline-related "compliance issues." [*Id.* ¶¶ 11–12.] In short, Turner held a leadership role defined by oversight and management of APS's discipline and student-records programs.

Turner's retaliation claim hinges on three disclosures that track her duties. First, she alleges that she reported noncompliance with the IDEA to her supervisor and other officials, including failures to conduct manifestation determination

reviews, the use of "illegal waivers," and other perceived statutory violations. [*Id.* ¶¶ 14–18.] Second, she claims she emailed Smith about grading-policy violations at an alternative school, claiming that certain grades were being improperly recorded. [*Id.* ¶¶ 25–26.] Third, she asserts she provided information to an employee relations investigator as part of its internal investigation into suspected drinking at a staff holiday party. [*Id.* ¶¶19–24.]

The central question is whether Turner uttered these disclosures as a private citizen or as the APS administrator. That inquiry turns on the "content, form, and context" of each disclosure viewed against Turner's job duties. *Abdur-Rahman*, 567 F.3d at 1284–85.

The answer is straightforward: every disclosure arose from the very programs Turner was paid to manage, was made internally, and involved no attempt to speak publicly. Each disclosure owed its existence to her ordinary duties and is thus unprotected employee speech. *See Alves*, 804 F.3d at 1161.

### a. Turner's IDEA-compliance disclosures were part of her core duties.

Start with Turner's disclosures about IDEA compliance. She admits her duties included overseeing APS's student-discipline processes and reporting "compliance issues" to APS leadership. [Doc. 7 ¶¶ 11–13.] Her reports about missed

manifestation determination reviews,[12] "illegal waivers," and procedural breakdowns all concerned misalignment between APS's disciplinary practices for students with disabilities and the IDEA. [*Id.* ¶¶ 14–16.] She directed her reports to her supervisor and other administrators. [*Id.* ¶¶14–15.]

These disclosures were employee speech under *Garcetti*. The content of the speech (legal compliance within the disciplinary process), form (internal workplace communications to administrators), and context (delivered while performing oversight duties for the Student Discipline Office) all confirm the disclosures "owe[d] [their] existence" to her professional responsibilities. *Garcetti*, 547 U.S. at 421. Indeed, if reporting violations of the IDEA's discipline procedures isn't part of the job of an administrator tasked with identifying student-discipline "compliance issues," it's hard to imagine what would be.

Beyond that, this Court has repeatedly held that internal complaints about operational and legal concerns within one's own department—particularly by employees charged with compliance oversight—are unprotected. *See Alves*, 804 F.3d at 1154–55, 1166–67; *Phillips*, 499 F.3d at 1242–43; *see also Abdur-Rahman v.*

---

[12] The IDEA requires a manifestation determination review (MDR) when a district considers a proposed disciplinary placement change—such as a suspension of more than 10 school days—for a student with disabilities. The MDR determines whether the conduct at issue "was caused by, or had a direct and substantial relationship to, the child's disability" or "was the direct result of the [district's] failure to implement the IEP." 20 U.S.C. § 1415(k)(1)(E)(i). Any reports about MDR practices are thus necessarily linked to APS's disciplinary processes.

*Walker*, 567 F.3d 1278, 1283 (2009) (holding that "the reports of the inspectors to their supervisors about sewer overflows they were required to investigate are not protected under the First Amendment"). The same is true for Turner's IDEA-related disclosures.

### b. Turner's grading-related disclosures were tied to her oversight of student discipline and records.

A similar analysis applies to her speech about grade-recording practices. [Doc. 7 ¶¶ 25–27.] Again, those communications fell within her job to oversee student discipline and records. [*Id.* ¶ 11.] Turner reported perceived grading discrepancies at an *alternative school*, Hank Aaron New Beginnings Academy. [*Id.* ¶ 25.] This fact is important because under Georgia law, alternative-education programs are part of a district's student-discipline structure. *See* O.C.G.A. § 20-2-154.1.[13] In other words, Turner's email to Smith about grades at the alternative school boiled down to a report about APS's broader disciplinary program—an area under her management. She raised these concerns only to Smith, her supervisor, and recommended addressing them with a "grade audit." [Doc. 7 ¶ 27.]

This internal reporting aimed to ensure policy compliance and correct flaws

---

[13] Georgia law authorizes school districts to create "alternative education programs," like Hank Aaron New Beginnings Academy, for "disruptive" students or those requiring removal from the regular classroom for academic reasons. O.C.G.A. § 20-2-154.1(a), (c). These programs "are intended to meet the education needs of a student who is suspended from his or her regular classroom" or those students "more likely to succeed in a nontraditional setting." *Id.* § 20-2-154.1(b).

in departmental practices. It is impossible to separate Turner's statements from the official responsibilities APS paid her to perform. *See Abdur-Rahman*, 567 F.3d at 1286. The content (irregularities in a program she oversaw), form (an internal email to her supervisor), and context (an attempt to improve grading and recordkeeping practices) all confirm Turner was acting "pursuant to employment responsibilities" when she contacted Smith about the alternative school. *See Garcetti*, 547 U.S. at 422–24. This is precisely the type of job-related speech this Court found unprotected in *Alves* and *Phillips*. It was error for the district to treat her grading disclosures as plausible citizen speech.

### c. Turner's participation in the holiday party investigation was employee speech.

Turner's statements to the employee relations investigator during its inquiry into suspected drinking at a staff holiday party also fall on the employee-speech side of the line. Her speech occurred during an employer-run investigation, through an employer-controlled process, about the conduct of APS employees. [*See* Doc. 7 ¶¶ 19–24.] The employee relations report attached to the Amended Complaint shows the individuals under scrutiny worked in the Office of Schools, the same division that housed the departments Turner oversaw. [*See* Doc. 7-1 at 8, 11.] Given her admitted "oversight" of multiple departments [*id.* ¶ 11], it is unsurprising that employee relations would seek her input about possible misconduct by staff in her orbit.

When Turner spoke to the investigator, she was acting as an APS administrator fulfilling a workplace obligation. She did not speak publicly or outside APS. She did not try to expose wrongdoing to anyone except APS's investigator. She simply provided information in the way any manager would during an internal inquiry. That is employee speech in its purest form: the content was workplace behavior; the form was statements to an internal investigator; and the context was an employer-led fact-finding process about staff misconduct. *See King v. Bd. of Cnty. Commissioners*, 916 F.3d 1339, 1350 (11th Cir. 2019) (holding that the plaintiff engaged in unprotected speech because she "spoke as an employee, raising an employment-related concern, in an employment setting.").

It is immaterial that participating in an internal investigation was not part of Turner's assigned duties. [Doc. 7 ¶ 12.] *Garcetti* shunned a narrow, job-description-based approach to assessing employee speech, favoring a "practical," real-world assessment of whether the speech arose from the employee's responsibilities. *See* 547 U.S. at 424–25. And *Alves* confirms that speech need not be formally required to be employee speech; the question is whether it "owed its existence" to the employee's role and was made "in the course of trying to perform" her duties. 804 F.3d at 1164–65. The same principle animated *Phillips*, where the city clerk's internal report about misconduct was unprotected even though her job description did not specifically require such reporting. 499 F.3d at 1242–43.

47

Beyond that, Turner spoke to employee relations because APS asked her to, not because she stepped outside her job to speak as a citizen. Cooperating with human resources is a standard expectation for any employee, especially for a senior administrator like Turner. "[S]peech the employee was expected to deliver in the course of carrying out his job" is not constitutionally protected. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022). That principle holds true even if an employee describes her duties "so narrowly as not to mandate the act of speaking." *Abdur-Rahman*, 567 F.3d at 1285.

The bottom line is that there is no plausible way to disentangle Turner's participation in the investigation from her role as an APS employee. For that reason, her statements to employee relations are not constitutionally protected.

### 3. The district court incorrectly analyzed Turner's speech.

For all those reasons, the district court should have found Turner did not allege protected speech. Instead, the district court declined to compare Turner's alleged duties and the disclosures she claims triggered retaliation, simply declaring that inquiry unfit until after discovery. [*See* Doc. 19 at 36.]

But this Court has repeatedly resolved the *Garcetti* question on the pleadings when the complaint describes the employee's duties and the context of the speech. In *Abdur-Rahman*, for example, this Court affirmed judgment on the pleadings because the plaintiffs' own allegations showed their speech "concerned information

48

they requested and investigations that they performed for the purpose of fulfilling their assigned job duties." 567 F.3d at 1283. In *Chambers v. Cherokee County*, this Court affirmed judgment on the pleadings that showed the employee's speech was "part of her job." 743 F. App'x 960, 963 (11th Cir. 2018). And in *Slay v. Hess*, this Court concluded, on the pleadings, that an employee's internal objection to falsifying time records was job-related, unprotected speech. 621 F. App'x 573, 576 (11th Cir. 2015).[14]

These decisions show the district court had more than enough to work with. Turner's allegations—her oversight of student discipline and records, her duty to report compliance issues, and the internal nature of each disclosure—provided all the factual content needed to compare Turner's responsibilities to her statements. The Amended Complaint was not so vague or indeterminate that the court needed more factual development before conducting the *Garcetti* analysis.

The district court relied heavily on *Carollo v. Boria*, 833 F.3d 1322 (11th Cir. 2016), to support its refusal to conduct a *Garcetti* analysis based on the pleadings. But *Carollo* differs factually in an important way. There, the plaintiff spoke at public city council meetings and to outside law-enforcement authorities. *Carollo*, 833 F.3d

---

[14] District courts in this Circuit routinely follow the same approach. *See, e.g.*, *Benavides v. Georgia Pub. Def. Council*, 2021 WL 2448360, at *12 (N.D. Ga. Jan. 14, 2021); *Mattix v. DeKalb County Sch. District*, 2014 WL 3579416, at *3–4 (N.D. Ga. July 18, 2014); *Gadjiev*, 2013 WL 5349854, at *3.

at 1326. Since that decision, this Court has distinguished between cases like *Carollo*, which involve external disclosures of unlawful conduct, and cases involving internal, employment-related disclosures. *See King*, 916 F.3d at 1350. The former concerns protected citizen speech; the latter does not.

That distinction matters here. Turner's speech differs from the outward-facing whistleblowing in *Carollo*. She did not take her concerns to law enforcement, to a public meeting, or to anyone outside APS. She spoke only inside APS. Her disclosures thus mirror the same pattern of speech this Court has held to be unprotected employee speech in a line of cases. *See King*, 916 F.3d at 1350; *Phillips*, 499 F.3d at 1242–43. If *Carollo* sits at one end of the spectrum, Turner's speech sits firmly at the other. Her suit is a straightforward *Garcetti* case, not an exception to it.

In short, the district court erred by refusing to conduct the analysis *Garcetti* requires. Turner's allegations provided everything the court needed to decide whether she spoke as an employee or as a private citizen. By declining to answer that question, the court sidestepped the core inquiry that governs every First Amendment retaliation claim. Properly applied, *Garcetti* forecloses Turner's retaliation theory, and the district court's decision to defer that analysis was error.

### B. Qualified immunity bars the claims against Smith and Montgomery.

Turner's First Amendment claims fail outright because she did not plausibly allege protected citizen speech. Even if the Court assumed otherwise, Smith and

Montgomery would still be entitled to qualified immunity. No Supreme Court or Eleventh Circuit precedent would have put a reasonable school district administrator on notice that Turner's internal, job-related speech was constitutionally protected. The district court erred by finding otherwise.

Once a defendant shows she acted with discretionary authority, the burden shifts to the plaintiff to identify clearly established law by pointing to materially similar precedent, a controlling general principle that obviously applies, or conduct so plainly unlawful that no case is needed. *See Holloman*, 370 F.3d at 1264; *Keating*, 598 F.3d at 760; *Gilmore*, 144 F.4th at 1258. That burden is especially hard to meet in First Amendment cases, which rarely yield "a clearly established principle that should control the novel facts of the situation." *Gaines*, 871 F.3d at 1209–10.

The Supreme Court confirmed the relevant qualified-immunity framework in *Lane v. Franks*, 573 U.S. 228 (2014). There, Edward Lane, a community college program director, uncovered that a state legislator on his program's payroll was getting paid despite doing almost no work. *Id.* at 232. Lane later testified before a grand jury and at two federal trials that resulted in the legislator's conviction for fraud and theft of federal funds. *Id.* at 232–33. Lane was later terminated. *Id.* at 233. He sued the college president, Steve Franks, alleging he was fired in retaliation for his testimony in violation of the First Amendment. *Id.* at 234.

Although the Supreme Court held that Lane's testimony was protected citizen

speech, it nonetheless found that qualified immunity protected Franks. *Id.* at 233, 243. In reaching that decision, the Court defined the relevant qualified-immunity question in a way that considered Franks' reasonable belief about his lawful authority and the scope of Lane's official duties together:

> Could Franks reasonably have believed, at the time he fired Lane, that a government employer could fire an employee on account of testimony the employee gave, under oath and outside the scope of his ordinary job responsibilities?

*Id.* at 243. The answer was yes. Because Eleventh Circuit precedent did not provide "clear notice" that Lane's testimony was protected, qualified immunity applied. *Id.* at 245.

*Lane* controls here. Existing law did not clearly establish that responding adversely to Turner's internal disclosures was unlawful. To the contrary, this court has held repeatedly that internal reports about operational, compliance, or personnel issues relating to an employee's own department or areas of oversight are unprotected speech. *See King*, 916 F.3d at 1350; *Alves*, 804 F.3d at 1164–65; *Abdur-Rahman*, 567 F.3d at 1285–86; *Phillips*, 499 F.3d at 1241–43; *see also Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (finding the plaintiff's internal disclosures about fraud and inaccuracies in student files were unprotected speech).

Turner's disclosures are cut from the same cloth: reports about IDEA compliance, grade-recording practices, and staff conduct, all made to other APS officials. The law no more clearly established the unlawfulness of Smith's and

Montgomery's conduct than it did Franks' in *Lane*. If qualified immunity applied there—even though Lane's testimony was outside his duties—it must apply here, given the close tie between Turner's speech and the work she was employed to perform.

Despite that settled framework, the district court denied qualified immunity anyway. Its faulty reasoning followed two steps. Relying on *Carollo*, the court asserted that plausible allegations of protected speech coupled with a broad constitutional principle sufficed to defeat qualified immunity. [*See* Doc. 19 at 42–43.] Applying that two-step framework, the court first found that Turner plausibly alleged citizen speech and, from there, invoked the general rule that public employees may not be retaliated against for protected speech.

The first premise—that Turner alleged protected speech—was wrong. As explained above, Turner alleged unprotected speech uttered pursuant to her official job duties. That was enough to end the qualified-immunity analysis. The court could have—and thus should have—reached that conclusion at the pleading stage. *See Pearson*, 555 U.S. at 231–32.

Beyond that mistake, the district court's analytical framework is at odds with *Lane* in multiple respects. To begin, the district court carved out the protected-speech issue from the broader qualified-immunity analysis. But under *Lane's* qualified-immunity formulation, whether an employee spoke pursuant to her duties must be

considered as part and parcel of the broader clearly-established-law inquiry. The two issues—whether the employee engaged in protected speech and whether the law gave clear notice that the defendant's conduct was unlawful—cannot be decoupled. But unlike *Lane*, the district court did not evaluate whether existing precedent gave "clear notice" that Turner's speech was protected. *See Lane*, 573 U.S. at 245. By failing to analyze that question, the district court effectively collapsed the two-part qualified-immunity analysis into one step.

The court compounded that error by relying on generalities rather than a fact-specific, clearly established rule. The Supreme Court forbids defining clearly established law "at a high level of generality." *White*, 580 U.S. at 79. Yet the district court invoked only the broad *Garcetti-Pickering* principle, that public employees have a right to speak as citizens on matters of public concern, as the controlling rule. That generic rule is not enough; the law needed to be "particularized to the facts." *Id.*

The court's reliance on *Carollo* underscores why that approach was wrong. *Carollo* involved external reports of corruption to law-enforcement and public officials—nothing like Turner's internal, job-related disclosures. *See King*, 916 F.3d at 1350. Reading *Carollo* to control here, despite its important differences, morphs the clearly-established-law inquiry into the kind of broad abstraction the Supreme Court has told courts to avoid.

54

In short, no precedent made it "beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), that Turner engaged in protected speech or that Smith or Montgomery violated the First Amendment. This Court's precedent easily could lead a reasonable official to conclude that Turner's employer-focused speech was not protected. As a result, a reasonable administrator would not have understood their alleged conduct to be unlawful. Smith and Montgomery are therefore entitled to qualified immunity, and the district court's contrary conclusion should be reversed.

## <u>CONCLUSION</u>

For all these reasons, Appellants ask this Court to reverse the district court and hold that Turner's ADA claims against Montgomery and Smith and her First Amendment claims against APS, Montgomery, and Smith should be dismissed.

Respectfully submitted this 15th day of December, 2025.

/s/ *Brandon O. Moulard*
Bennett D. Bryan
Georgia Bar No. 157099
Brandon O. Moulard
Georgia Bar No. 940450
*Counsel for Appellants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30309
678.690.5750 (phone)
404.869.6972 (facsimile)
bennettbryan@parkerpoe.com
brandonmoulard@parkerpoe.com

55

## **TYPE-VOLUME COMPLIANCE**

Pursuant to Rule 32(a)(7)(B) of the Rules of the United States Court of Appeals for the Eleventh Circuit, the undersigned counsel for the Appellants certifies that this principal brief complies with the type-volume limitation of the rules concerning the number of words (13,000) in a brief. Appellants certify that the number of words in this Brief is 12,478, excluding the parts of the brief exempted by Rule 32(f)(7) and Eleventh Circuit Rule 32-4. Appellants certify that the number of words in this Brief was calculated by the word processing program Microsoft Word.

Respectfully submitted this 15th day of December, 2025.

/s/ *Brandon O. Moulard*
Bennett D. Bryan
Georgia Bar No. 157099
Brandon O. Moulard
Georgia Bar No. 940450
*Counsel for Appellants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30309
678.690.5750 (phone)
404.869.6972 (facsimile)
bennettbryan@parkerpoe.com
brandonmoulard@parkerpoe.com

56

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this day I electronically filed the foregoing **BRIEF FOR DEFENDANTS-APPELLANTS** using the Court's CM/ECF filing system, which will serve an electronic copy of the same to these attorneys of record:

Gerald Weber                    Craig Goodmark
wgerryweber@gmail.com            cgoodmark@gmail.com

Respectfully submitted this 15th day of December, 2025.

<u>*/s/ Brandon O. Moulard*</u>
Bennett D. Bryan
Georgia Bar No. 157099
Brandon O. Moulard
Georgia Bar No. 940450
*Counsel for Appellants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street, NE
Suite 1500
Atlanta, Georgia 30309
678.690.5750 (phone)
404.869.6972 (facsimile)
bennettbryan@parkerpoe.com
brandonmoulard@parkerpoe.com